## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| HANDELSBANKEN FONDER AB, on behalf of itself and all others similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| UPSTART HOLDINGS, INC., DAVID J. GIROUARD, and SANJAY DATTA, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Handelsbanken Fonder AB ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Upstart Holdings, Inc. ("Upstart" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst reports concerning Upstart; and (iv) other public information regarding the Company.

## INTRODUCTION

1.      Plaintiff brings this securities class action on behalf of all investors that purchased Upstart securities between March 18, 2021 and May 9, 2022, inclusive (the "Class Period"), including common stock and Convertible Senior Notes due 2026 issued by Upstart in a private offering to qualified institutional buyers on or around August 18, 2021 (the "Convertible Senior

Notes"). The claims asserted herein are alleged against Upstart and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder.

2. Upstart is a financial technology company that uses artificial intelligence ("AI") and data science to underwrite personal loans predominantly to borrowers whose limited or poor credit history generally precludes them from obtaining loans from more traditional sources. Upstart claims that its underwriting process enables banking partners to originate loans with higher approval rates and lower loss rates than traditional underwriting processes.

3. The Company partners with banks to offer credit to consumers, either directly through Upstart's website or through its banking partners' websites that are embedded with Upstart's technology, and charges fees for the use of Upstart's technology. Upstart's fee-based business model is predicated on moving large volumes of loans through its platform and then placing the loans the Company underwrites with banks or institutional credit investors, thereby keeping loans off its balance sheet and largely insulating itself from credit risk.

4. Throughout the Class Period, Defendants repeatedly stated that Upstart's AI-based models could underwrite loans in a way that was far superior to traditional underwriting processes and lead to the origination of less risky credit. Upstart heralded the predictive capabilities of its AI technology, which would purportedly allow it to handle a recession "far better than a traditional system would." The Company also represented that it would fund a limited amount of loans from its balance sheet only to support the research and development of new loan products, and that it would maintain limited exposure to credit risk.

5.     These and similar statements made during the Class Period were false and misleading.  In reality, the Company's AI-based underwriting model was unable to adequately assess credit risk in changing macroeconomic conditions, such as rising interest rates and inflation. As a result, Upstart had been increasingly underwriting progressively less creditworthy loans throughout the Class Period, requiring the Company to fund a significant amount of loans from its balance sheet to support loan transaction volume and stabilize its business, and thereby exposing Upstart to significant credit risk.  As a result of Defendants' misrepresentations, Upstart securities traded at artificially inflated prices throughout the Class Period.

6.     The truth emerged after the market closed on May 9, 2022, when the Company announced its financial results for the first quarter of 2022.  Specifically, Upstart reported that it held approximately $604 million worth of loans, notes, residuals on its balance sheet—more than double the $261 million it held at the end of the previous quarter.  Upstart acknowledged that the significant increase in the amount of loans retained on its balance sheet was the result of rising "default rates" on loans originated in the second half of 2021 as well as "rising interest rates and rising consumer delinquencies putting downward pressure on conversion."[1]  Further, Upstart revealed that, while the Company had historically used its balance sheet "almost exclusively" for the research and development of new loan products, in the first quarter of 2022 Upstart used its balance sheet as "a market-clearing mechanism" to support the Company's loan transaction volume and stabilize its business.

7.     The Company also confirmed that it had recently "loosened" its loan modification policy to make it easier for Upstart borrowers to obtain forbearance of their loan payments.  This

---

[1] The Company defines its "conversion rate" metric as "the number of loans transacted in a period divided by the number of rate inquiries received that [Upstart] estimate[s] to be legitimate."  Thus, all else being equal, a higher conversion rate means more fee-based revenue generated by Upstart.

had the effect of converting the status of "delinquent" loans to "current," and likely masked the true extent of delinquent Upstart loans. Moreover, Upstart slashed its 2022 revenue guidance by $150 million and issued revenue guidance for the second quarter of 2022 that was well below estimates the Company had led investors to expect. Contrary to Upstart's prior statements touting its ability to handle a recession "far better than a traditional system would," the Company attributed its weak outlook to "macro uncertainties" and "the prospect of a recession."

8.    In the wake of these disclosures, one analyst dismissed the Company's purported "market clearing" justification for the significant increase in the amount of loans held on Upstart's balance sheet, explaining that the increase represented a "divergence" from the Company's "capital-light business model" that indicated Upstart had "few alternatives other than to hold more loans due to funding issues." As a result of these disclosures, the price of Upstart stock declined by more than 56%, from a closing price of $77.13 per share on May 9, 2022, to a closing price of $33.61 per share on May 10, 2022. Additionally, the price of Upstart's Convertible Senior Notes declined by $13.37, or approximately 18.2%, based on a comparison of the last trade price on May 9, 2022 before the Company's disclosures and the last trade price on May 10, 2022.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.    Venue is proper in this District under 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Upstart is headquartered in Columbus, Ohio which is situated in this District and many of the acts and conduct that constitute the violations complained of herein

occurred in this District. In addition to its headquarters, the Company also maintains an additional office in this District, where it conducts substantial operations. Moreover, at least several of Upstart's lending partners through which the Company facilitates loans are based in Ohio, including some financial institutions that are headquartered in this District. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

<div align="center">

**PARTIES**

</div>

**A.      Plaintiff**

12.      Plaintiff is a mutual fund management company based in Stockholm, Sweden. As indicated in the certification submitted herewith, Plaintiff, through its investment funds Handelsbanken Global Index Criteria and Handelsbanken USA Index Criteria, purchased Upstart common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.      Defendants**

13.      Defendant Upstart is incorporated under the laws of Delaware with its headquarters in Columbus, Ohio. The Company's common stock trades on the Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "UPST." On or around August 18, 2021, Upstart issued $575,000,000 of 0.25% Convertible Senior Notes due 2026 in a private offering to qualified institutional buyers pursuant to Rule 144A promulgated under the Securities Act of 1933, as amended. The Convertible Senior Notes will mature on August 15, 2026, unless earlier redeemed, repurchased, or converted, but Upstart may not redeem the Convertible Senior Notes prior to August 20, 2024. The Convertible Senior Notes will be convertible at an initial conversion rate of 3.5056 shares of Upstart's common stock per $1,000 principal amount of Convertible Senior

<div align="center">

5

</div>

Notes. Prior to the close of business on the business day immediately preceding May 15, 2025, the Convertible Senior Notes will be convertible at the option of the noteholders only upon the satisfaction of specified conditions and during certain periods. On or after May 15, 2026, until the close of business on the second scheduled trading day preceding the August 15, 2026 maturity date, the Convertible Senior Notes will be convertible at the option of the noteholders at any time regardless of these conditions. Conversions of the Convertible Senior Notes will be satisfied in cash, shares of Upstart common stock, or a combination thereof, at the election of Upstart.

14. Defendant David J. Girouard ("Girouard") was a co-founder of the Company and has served as Upstart's President, Chief Executive Officer ("CEO"), and Chairperson of the Board of Directors at all relevant times.

15. Defendant Sanjay Datta ("Datta") has served as Upstart's Chief Financial Officer ("CFO") at all relevant times.

16. Defendants Girouard and Datta are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with Upstart, possessed the power and authority to control the contents of the Company's reports to the SEC and other public statements made by Upstart during the Class Period. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports and other statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

**BACKGROUND**

17.     Upstart was founded in 2012 on the premise that the Company could offer a smarter credit origination model that would enable lenders to approve more loans with fewer defaults than traditional underwriting processes.  The Company went public through an initial public offering on December 16, 2020.

18.     Upstart operates an online lending marketplace and uses AI and data science to underwrite consumer credit.  The Company partners with banks and credit unions to provide personal and auto loans ranging from $1,000 to $50,000, at annual percentage rates ranging from 6.5% to 35.99%, with terms typically ranging from three to seven years.  The Company's AI models purportedly use more than 1,500 non-conventional sources of risk quantification, such as education and employment, to assess default risk, and look beyond the traditional FICO-based lending model.

19.     Upstart generates revenue from fees it charges to banks.  Specifically, the Company charges: referral fees for each loan referred by Upstart and originated by a bank partner; platform fees each time a bank partner originates a loan using Upstart's platform; and loan servicing fees as consumers repay their loans.  Upstart's bank partners can also pay the Company a licensing fee to add Upstart's technology through an interface on the bank partner's own website or mobile application.

20.     Loans underwritten by Upstart, which the Company refers to as "Upstart powered loans," are funded in one of three ways: the Company's banking partners will fund loans that they want to keep on their balance sheet; for loans that banks do not want to retain, Upstart seeks to securitize those loans for investment by institutional credit investors; and when neither the Company's banking partners nor institutional credit investors are willing to fund the loans, Upstart will fund the loans from its own balance sheet.  Generally, Upstart seeks to place all loans with

banks or institutional investors, thereby keeping loans off its balance sheet and limiting its exposure to credit risk. Accordingly, Upstart's fee-based business model is predicated on generating loan volume.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

21. The Class Period begins on March 18, 2021, the trading day after Upstart announced its financial results for the fourth quarter and full year ended December 31, 2020. During the Company's earnings call with analysts on March 17, 2021, after the market closed, Upstart's co-founder and CEO, Defendant Girouard, explained that "Upstart is a fee-based business" that "do[es not] make loans," and assured investors that "we aren't exposed to material balance sheet risk." Girouard touted the ability of Upstart's AI model to target default risk as "the centerpiece of our system" because "[i]t predicts not just the likelihood that a loan will default, but when that default can be expected to happen" thereby offering advantages to the Company's lending partners in the form of "higher approval rates, lower loss rates and a highly automated digital experience" and "enables lending programs that are more predictable, more profitable, and more inclusive."

22. Also during the call, the Company's CFO, Defendant Datta, stated that Upstart carried an aggregate balance of loans, notes, and residuals of $98 million on its balance sheet at the end of 2020, down from $266 million at the end of 2019, which purportedly reflected the Company's "continued reduction in the percentage of platform loans funded through [Upstart's] balance sheet." Further, in response to an analyst's question about securitizations of loans underwritten by Upstart, Datta represented that the Company's pipeline "is as good as it's ever been with respect to demand for loans on the funding side" and "funding has not been an obstacle to [the Company's financial results] in any way."

23.     On May 11, 2021, Upstart announced its financial results for the first quarter of 2021. During the Company's earnings call with analysts that day, Girouard assured investors that the Company's rapid growth was sustainable because it is "primarily technology and model-driven, which manifests as increasing conversion rates in our borrower funnel."  Datta then highlighted that the Company's aggregate balance of loans, notes, and residuals had decreased to $73.2 million from $227.5 million at the end of the same quarter in the prior year, and reassured investors of Upstart's trend of a "continuing reduction in the percentage of platform loans funded through our own balance sheet."  Girouard also touted various upgrades that Upstart had made to its AI models during the quarter, stating that "[t]his upgrade led to higher approval rates and lower interest rates which, of course, translates into more loans."  In response to an analyst's question about how the model upgrades translated into higher conversion rates for the Company, Girouard explained that Upstart's model "gets smarter about separating good credits from bad credits" and "[i]t thereby helps us avoid offering loans to those who are more likely to default and the effect of that, which is the most basic sort of building block of our business, is that it allows us to approve more people at generally lower rates."

24.     During a June 9, 2021, Bank of America Global Technology Conference, Girouard represented that because Upstart's "revenue is almost entirely fees paid to [the Company] by banks not subject to claw-backs," the Company's ability to generate revenue is not "anything related to quality of credit performance."  In response to an analyst's question about how Upstart would be able to respond to a credit cycle, Girouard represented that "[c]redit quality is the sort of true north of the company" and Upstart's model will handle "disruptions in the economy" and a "recession far better than a traditional system would" because "[i]t can very quickly adjust itself to handle the macro situation that is evolving out there."  Similarly, Girouard contended that Upstart had "a

great proof point that a model like ours actually can handle disruptions in the economy and dislocations better than a standard model."

25.     On August 10, 2021, Upstart announced its financial results for the second quarter of 2021.  During the Company's earnings call with analysts that day, Defendant Girouard touted that Upstart's "more powerful algorithms and growth in training data. . . . led to a boost in approval rate and a more accurate system overall" and "continued to drive separation between our AI-powered platform and more conventional lending systems."  During the call, Defendant Datta also reported on the state of the Company's balance sheet, stating that, "[i]n terms of loan assets, [Upstart] carried an aggregate balance of loans, notes, and residuals of $95.3 million," which was up from $73.2 million in first quarter of 2021, but down from $148 million at the end of the same quarter in the previous year.  Datta reassured investors that "these loan assets represent the totality of the direct exposure we have to credit risk."

26.     During a September 9, 2021, Deutsche Bank Technology Conference, Defendant Girouard touted the application of Upstart's AI-based technology as "a Holy Grail of credit and lending," because the Company was "developing models for credit origination that are more accurately measuring risk than the legacy systems, which tend to be FICO centric" and are therefore "able to approve more borrowers at lower rates and actually, lower loss rates."  Regarding Upstart's exposure to credit risk, Girouard again assured investors that "we don't take risk in the loans" because "we aren't in any sense a lender ourselves," but rather "[w]e provide a toolset to banks to originate credit and charge them fees to use it."  Further, in response to an analyst's question about the competitive advantages of Upstart's platform, Girouard heralded its "product that can approve more borrowers at lower loss rates" as "a fairly magical thing" because its "AI-

10

based system is [ ] always getting better" and "we're getting more sophisticated AI as we go and our model is inevitably getting more accurate as time goes by."

27.    On November 9, 2021, Upstart announced its financial results for the third quarter of 2021.  During the Company's earnings call with analysts that day, Defendant Datta noted that the aggregate balance of loans, notes, and residuals on the Company's balance sheet had climbed to $140 million, up from $95.3 million in the previous quarter, but down from $145 million at the end of the same quarter in the previous year.  Datta did not attribute the increase to anything having to do with the deteriorating quality of Upstart's loans.  Instead, Datta claimed that the reason the "dollar volume of loans we carry is edging upwards" was the Company's "use [of] our balance sheet to support the scaling of our growing auto product, as well as our expansion into the lower credit score segments of personal lending."  Further, in response to an analyst's question about demand to fund Upstart-powered loans, Girouard represented that the Company would remain largely insulated from credit risk by quickly placing loans with its partners because Upstart has "[a] lot of banks who are originating loans for their own balance sheets" as well as "banks that are selling through to 100-plus, 150-plus capital markets, partners," and that creates a "very liquid environment."  Similarly, Datta assured investors that "even when we're past the current . . . distortion in the market, we'll be in pretty good shape with respect to demand."

28.    On February 15, 2022, Upstart announced its financial results for the fourth quarter and full year ended December 31, 2021.  During the Company's earnings call with analysts that day, Defendant Datta assured investors that while the Company was "cognizant of the fluidity in the macro environment," it was "not expecting any meaningful adverse impact from rising defaults on our volumes or economics" because "[i]t's not . . . a longer term . . . increase in default profile." Specifically, while Datta reported that the balance of loans, notes, and residuals on the Company's

balance sheet had increased to $261 million, up from the $140 million reported in the previous quarter, he again did not attribute the result to deteriorating loan quality that limited demand from banks and investors to fund those loans. Instead, Datta claimed that the increase "reflect[ed] the accelerated pace of [research and development]" and was the result of the Company's reinvestment of $170 million "in the form of loans made in support of new [research and development] programs." Despite the increase in loans retained on Upstart's balance sheet, the Company told investors to expect Upstart to generate revenue of $1.4 billion in 2022.

29. During a March 9, 2022, Morgan Stanley Media and Telecom Conference, Defendant Girouard touted Upstart's ability to successfully navigate a downturn in the economy. Specifically, Girouard represented that "volatility and turbulence . . . is an environment that we shine in" and "more noise, more volatility ends up being a good thing for us as a company because we can handle it, manage it better than others," particularly since "we're a very lightweight company" with a "small balance sheet." Girouard then assured investors that "we're a company that thrives in this type of environment and we will, without question, come out stronger on the other side."

30. The above statements identified in ¶¶ 21-29 were materially false and/or misleading. In truth, Upstart's AI-based underwriting model could not (and did not) adequately account for macroeconomic factors such as rising interest rates and inflation as well as the expiration of the U.S. government stimulus related to the COVID-19 pandemic, and the Company had been increasingly underwriting progressively less creditworthy loans. Weakening delinquency and default trends on loans underwritten by Upstart caused demand from credit investors and the securitization market to decline, which was negatively impacting Upstart's conversion rate. As a result, Upstart would use its balance sheet to fund loans to support volume, rendering the Company significantly more exposed

to credit risk. As a result of the foregoing, Defendants' statements about Upstart's limited exposure to credit risk and business, operations, and prospects, including its 2022 guidance, were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

31. The truth emerged on May 9, 2022, after the market closed, when Upstart announced its financial results for the first quarter of 2022. The Company revealed that the balance of loans, notes, and residuals held on the Company's balance sheet had more than doubled in just one quarter, from approximately $261 million for the period ended December 31, 2021, to more than $604 million for the period ended March 31, 2022.

32. During the Company's earnings call with analysts held later that day, Defendant Girouard admitted that Upstart "observed more volatility" for loans funded by institutional investors and capital markets participants, which he attributed to "the abrupt termination of [COVID-19-related government stimulus] programs [which] caused some of the more recent vintages to underperform." Defendant Datta further acknowledged that the significant increase in the amount of loans retained on the Company's balance sheet was the result of rising "default rates" on loans originated in the second half of 2021 and stated that "the macro environment has become an increasing headwind to growth this past quarter, with both rising interest rates and rising consumer delinquencies putting downward pressure on conversion." Moreover, Datta revealed that, while historically the Company had used its balance sheet "almost exclusively for the purposes of [research and development]" of new loan products, such as auto lending and new segments of personal lending, in the first quarter of 2022, Upstart funded loans using its own balance sheet as "a market-clearing mechanism" to support the Company's loan transaction volume and stabilize its business.

33.     In addition, Defendant Datta confirmed that Upstart had recently "loosened" the Company's loan modification policy to make it easier for Upstart borrowers to obtain forbearance of their loan payments and "make it a program that was . . . more widely applicable."  Those looser forbearance standards, which have the effect of converting the status of "delinquent" loans to "current," have likely masked the true extent of delinquencies on Upstart loans, which will likely continue to trend higher and put even more downward pressure on Upstart's conversion rate and business model.

34.     Further, as a result of "macro uncertainties" and "the prospect of a recession," Upstart also slashed its full year revenue guidance for 2022 by $150 million, from $1.4 billion to $1.25 billion.  The Company also issued disappointing guidance for the second quarter of 2022, expecting revenues of $295 million to $305 million, which, at the midpoint, was $35 million below analysts' expectations.  As a result of these disclosures, Upstart's stock price declined by $43.52 per share, or more than 56%, from a closing price of $77.13 per share on May 9, 2022, to a closing price of $33.61 per share on May 10, 2022.  In addition, the price of Upstart's Convertible Senior Notes declined by $13.37, or approximately 18.2%, based on a comparison of the last trade price on May 9, 2022 before the Company's disclosures and the last trade price on May 10, 2022.

35.     On May 10, 2022, during an interview with Defendant Girouard, CNBC's Jim Cramer chastised the Company and its CEO, as Cramer was "shocked at the . . . potentially bad loans on [Upstart's] balance sheet," describing it as "certainly ill-advised to have that many loans on [the Company's] balance sheet" and explaining that "a lot of the bankers tell me it was because [Upstart] couldn't get rid of them."

36.     In a report issued on May 10, 2022, an analyst at Wedbush Securities noted that "[w]hile the Company claims that its decision to keep more loans on-balance sheet was used as a

14

market clearing mechanism due to interest rate moves, we see this as a divergence from its capital-light business model and could indicate [Upstart] has few alternatives other than to hold more loans due to funding issues."

37.    In a subsequent report issued on May 13, 2022, the same Wedbush Securities analyst highlighted a May 11, 2022 Kroll Bond Rating Agency ("Kroll") surveillance report regarding certain of Upstart's securitization trusts.  In that report, Kroll stated that it "now expects loss rates to be higher than previously expected for Upstart's pass-through securitizations issued in 2021."  The analyst further noted that Upstart had adopted significant changes to its loan modification policy, which led to a material increase in Upstart's loan modifications from March to April 2022, and "these increases in loan modifications could be enough to avoid tripping early triggers in the near term since delinquent borrowers who opt-in to the loan modification program are reclassified to 'current' status."

## LOSS CAUSATION

38.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Upstart securities and operated as a fraud or deceit on the Class (as defined below).  Later, when the truth concealed by Defendants' prior misrepresentations and omissions was disclosed to the market, the price of Upstart securities fell precipitously.  As a result of their purchases of Upstart securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all investors that purchased Upstart securities during the Class Period, including common stock and the Convertible Senior Notes (the "Class").  Excluded from

the Class are Defendants and their families, directors and officers of Upstart and their families and affiliates.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims as a class action will provide substantial benefits to the parties and the Court.  As of March 31, 2022, Upstart had more than 84 million shares of common stock outstanding, owned by hundreds or thousands of investors.  In addition, on or around August 18, 2021, Upstart issued $575,000,000 of 0.25% Convertible Senior Notes due 2026 in a private offering to qualified institutional buyers pursuant to Rule 144A promulgated under the Securities Act of 1933, as amended.

41.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Upstart securities;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damages sustained by Class members and the appropriate measure of damages.

42.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

43.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

44.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

45.     Upstart's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

46.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Upstart who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

47.     At all relevant times, the market for Upstart's securities was an efficient market for the following reasons, among others:

(a)     Upstart's common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     Since the Company issued the Convertible Senior Notes on or around August 18, 2021, through May 9, 2022, approximately 95% of the trading days during that time had at least one trade of Convertible Senior Notes, and there was an average of between 7 to 8 trades per day on days when there was a trade, with a maximum of 83 trades on one day;

(c)     Given the Convertible Senior Notes are convertible into shares of Upstart's common stock, the prices at which Upstart's Convertible Senior Notes and shares of Upstart's common stock trade in the market move in a manner consistent with one another;

(d)     As a regulated issuer, Upstart filed periodic public reports with the SEC and the NASDAQ;

(e)     Upstart regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f)     Upstart was followed by several securities analysts employed by numerous major brokerage firms, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

48.     As a result of the foregoing, the market for Upstart securities promptly digested current information regarding Upstart from all publicly available sources and reflected such

information in the price of Upstart securities.  Under these circumstances, all purchasers of Upstart securities during the Class Period suffered similar injury through their purchase of Upstart securities at artificially inflated prices and the presumption of reliance applies.

49.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**Against All Defendants**

50.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

51.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Upstart securities at artificially inflated prices.

52.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Upstart securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

53.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

54.     During the Class Period, Defendants made the false statements specified above, which they knew to be false and misleading, or recklessly disregarded the truth that they were false and misleading, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Upstart's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

56.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Upstart securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Upstart securities had been artificially inflated by Defendants' fraudulent course of conduct.

57.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

58.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

59.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

60.     The Individual Defendants acted as controlling persons of Upstart within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Upstart, the Individual Defendants had the power and ability to control the actions of Upstart and its employees.  By reason of this conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 7, 2022

<div style="margin-left: 50%;">

*/s/ John C. Camillus*
_____
John C. Camillus, Trial Attorney (0077435)
**LAW OFFICES OF JOHN C.**
  **CAMILLUS, LLC**
P.O. Box 141410
Columbus, OH 43214
Telephone: (614) 992-1000
Facsimile: (614) 559-6731
jcamillus@camilluslaw.com

*Liaison Counsel for Plaintiff Handelsbanken Fonder AB*

Jeroen van Kwawegen
Scott R. Foglietta
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jeroen@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiff Handelsbanken Fonder AB*

</div>